# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-743


**HENRY MARANGE, JR.**

**VERSUS**

**CUSTOM METAL FABRICATORS, INC., ET AL.**



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 10-01916
CHARLOTTE A. L. BUSHNELL, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.

**REVERSED AND RENDERED.**

**Kathleen Wigginton Will**
**Juge, Napolitano, Guilbeau, Ruli, Frieman & Whiteley**
**3320 West Esplanade Avenue North**
**Metairie, LA 70002**
**Telephone:  (504) 831-7270**
**COUNSEL FOR:**
   **Defendants/Appellees - Bridgefield Casualty Insurance Company and Custom Metal Fabricators, Inc.**

**Gregory Paul Allen Marceaux**
**2901 Hodges Street**
**Lake Charles, LA 70601**
**Telephone:  (337) 310-2233**
**COUNSEL FOR:**
   **Plaintiff/Appellant - Henry Marange, Jr.**

**THIBODEAUX, Chief Judge.**

Henry Marange Jr. appeals from a judgment by the office of Workers' Compensation (OWC) denying him medical treatment, medical expenses, wage benefits, and penalties and attorney fees, for injuries sustained while employed with Custom Metal Fabricators, Inc.  Finding that the OWC was manifestly erroneous in its decision to deny benefits, we reverse and render specific awards on each issue.

## I.

## ISSUES

We must decide:

(1)    whether the trial court manifestly erred in failing to find that the claimant sustained a work-related injury;

(2)    whether the trial court manifestly erred in failing to find that the claimant was entitled to medical and wage benefits; and

(3)    whether the trial court manifestly erred in failing to award penalties and attorney fees.

## II.

## FACTS AND PROCEDURAL HISTORY

Henry Marange, Jr., was employed as a welder by Custom Metal.  On December 28, 2009, while grinding weld seams inside a cone-shaped section of a vessel, his foot slipped on grinding dust, and his body twisted to the left as he fell forward with the weight of the turning grinder and the force of forward motion.  He felt burning and pulling in his low back and buttocks but continued to work without reporting the incident.  At the morning break, he was called to the phone regarding a family emergency.  He left work to assist with his invalid mother's possible hospitalization, and he did not return to work for the remainder of the day.

The following morning, Mr. Marange awoke with burning and pulling in his low back and right leg and required assistance getting out of bed. He called Custom Metal around 7:00 a.m., reported the incident of the previous morning, and asked to be sent to a physician. The employee to whom he had spoken was Karen Porter, the company's accountant. Ms. Porter called Mr. Marange back thirty minutes later to inform him that the owner of Custom Metal, Jimmy Cureton, would not pay for medical treatment because Mr. Marange did not report an accident. Mr. Marange went to the emergency room (ER) at West Calcasieu Cameron Hospital on his own. The medical record of that visit indicates that Mr. Marange had low back pain radiating into his right leg due to the previous day's "injury on duty while using a grinder."

In January 2010, Mr. Marange made two unanswered demands for medical treatment and workers' compensation benefits and then filed a motion for medical treatment by Dr. Clark Gunderson. The OWC ordered a medical examination by Dr. Gunderson.

Dr. Gunderson found that Mr. Marange had developed sciatica related to the December 28, 2009 work injury and that he was temporarily totally disabled as a result. Dr. Gunderson prescribed physical therapy and ordered an MRI and a return visit. He noted that Mr. Marange had also received treatment at W.O. Moss Regional Medical Center for this injury.

Mr. Marange made a demand for payment of his medical bills and for the physical therapy and return visit ordered by Dr. Gunderson. Custom Metal has not authorized payment for this medical treatment.

Following the trial of this matter, the OWC found that Mr. Marange failed to carry his burden of establishing that he had sustained a work-related injury under *Bruno v. Harbert Intern. Inc.*, 593 So.2d 357 (La.1992). Mr. Marange

appeals from that judgment seeking medical treatment, payment of his medical expenses, temporary total disability benefits, penalties, and attorney fees.

## III.

## STANDARD OF REVIEW

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

  a. the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

  b. the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

## IV.

## LAW AND DISCUSSION

Mr. Marange's accident was unwitnessed. He stated that he was standing, grinding a weld seam at shoulder level, with his weight pushing on the grinder, and with his right foot propped on the cylinder wall. When his right foot slipped off the wall, where grinding dust had accumulated, his body twisted to the left with the grinder still turning, and he fell forward. He experienced burning and pulling in his low back and buttocks.

The workers' compensation judge stated in her reasons for judgment that Mr. Marange testified that he was grinding overhead, and that his assertions that he was grinding overhead did not comport with the testimony of fellow workers. She found that, under *Bruno*, 593 So.2d 357, the co-workers of Mr. Marange discredited or cast serious doubt on Mr. Marange's version of the

3

accident. The workers' compensation judge cited Kyle Bourgeois, Custom Metal's quality control manager, for his testimony that no one was expected to grind overhead and that he never saw Mr. Marange grinding at shoulder level or standing to grind. The workers' compensation judge further cited the testimony of co-worker Mike Ellzey, who said that the grinders weighed only five to six pounds, that no grinding was done on the sides of the cylinder, and that he did not recall Mr. Marange standing to grind. Based upon this testimony, she found that Mr. Marange failed to establish his case by a preponderance of the evidence. We disagree.

> Our jurisprudence provides:
>
> [A]s in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. [*Prim v. City of Shreveport*, 297 So.2d 421 (La.1974)]; *Nelson* [*v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991). A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends. Malone & Johnson; *Nelson*, [588 So.2d 350]. Corroboration may also be provided by medical evidence. *West*, [371 So.2d 1146].

*Bruno v. Harbert Intern. Inc.*, 593 So.2d 357, 361 (La.1992).

> When there is proof of an attendant disability, without an intervening cause, it is presumed that the accident caused the disability. Additionally, the trier of fact's determination as to whether a compensable injury was suffered is a question of fact and will not be disturbed unless manifestly erroneous or clearly wrong.

*Capitol Mfg. Co. v. Brooks*, 99-267, p. 6 (La.App. 3 Cir. 11/3/99), 745 So.2d 825, 829, *writ denied*, 99-3411 (La. 2/4/00), 754 So.2d 236 (citations omitted).

4

> [A]n intermediate appellate court is not required to follow blindly the factual determinations of a trial court without discerning whether that court's discretion in evaluating facts and credibility has been abused. Certainly, the fact finder should be accorded great latitude and discretion, but discretion must always be buttressed by sound judgment. It is not immutable. To extend the quality of immutability to a fact finder's determinations simply because it articulates the magical word, "credibility" effectively limits and circumvents an appellate court's constitutionally given power to review facts.

*Butler v. Zapata Haynie Corp.*, 92-71, p. 7 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, 1279, *writ granted in part, judgment amended* (to adjust amount of lost earnings awarded by majority), 94-1171 (La. 7/5/94), 639 So.2d 1186, *cert. denied*, *Zapata Protein (USA), Inc. v. Butler*, 513 U.S. 1017, 115 S.Ct. 579 (1994).

Here, the record does not support the trial court's conclusions that Mr. Marange did not meet his burden of proving that he sustained a work accident by a preponderance of the evidence or that his testimony was discredited by the testimony of co-workers. Contrary to the court's finding, Mr. Marange did *not* testify that he was grinding overhead. He testified that he was grinding at shoulder level. The testimony of co-workers did not, as the trial court found, directly contradict Mr. Marange's version of the events. Moreover, the objective evidence favors Mr. Marange and militates against the lack of support expressed by the trial judge.

The testimony of Kyle Bourgeois did not dispute Mr. Marange's testimony regarding the performance of grinding work in a standing position. Mr. Marange testified that he was grinding at shoulder level on an inside weld seam that ran up the side of the cylindrical cone-shaped section of the vessel. He stated that the seam ran around the cylinder, that he had to grind up so far and then the vessel would be rolled over to finish grinding the rest of the seam. Mr. Marange testified that he was standing, bracing himself with his right foot on the cylinder

wall, his weight pushing on the grinder, and the grinder pushing on the wall, when his right foot slipped off the wall. He fell forward with the grinder turning, and was twisted to the left, resulting in the injury. He was working alone at the time.

Kyle Bourgeois testified that the floor-to-ceiling height inside the cylinder was eight or nine feet and that the welded seams inside the cylinder were 360-degree welds. He stated that the easiest way to grind seams was while seated. He indicated that there was never an occasion to grind overhead because the metal shop used a crane to rotate the cylinder such that the weld portion to be ground was positioned on the floor. However, he admitted that every portion of a 360-degree weld had to be ground smooth; this would include the weld as it ran up the side of the cylinder. Mr. Bourgeois did *not* say that there was never an occasion to grind at shoulder level. In fact, at trial, the following colloquy took place between counsel for Custom Metal and Kyle Bourgeois:

> Q. And the same with the sides: Is there ever an occasion where a man would have to stand up and [grind] on the side of the cylinder?
>
> A. Where he could physically reach it; but if he couldn't touch it or reach it, that's the point of rolling it around to where he could reach it.

This testimony indicates that a worker inside the cylinder must follow the weld as it goes around the cylinder, as long as he can reach or physically touch the weld, before using the crane to rotate the cylinder. Kyle Bourgeois's testimony supports, rather than disputes, Mr. Marange's version of the work environment. Both testified that it takes two men to operate the crane to rotate the cylinder, and both testified that the worker grinds a weld as far up as possible before using the crane to rotate the cylinder. Mr. Marange indicated that companies do not want the risk of injuries from faulty cranes; therefore, they expect one to use the crane to roll the vessel as little as possible. Another co-worker, Mike Ellzey, testified that the cylinder is turned only once every other day.

6

Kyle Bourgeois testified that he had seen Mr. Marange twice on the morning of the incident, and that he was working seated, not standing, at those times. This testimony, however, accounts for only a few minutes out of a two-and-one-half hour period of work, and it does not *seriously* discredit, as *Bruno* requires, Mr. Marange's testimony that he was standing when the accident occurred. Kyle Bourgeois testified that he sent Mike Ellzey to help Mr. Marange on the morning of the incident, but he admitted that Ellzey was subject to being called away as a helper in other areas of the shop and did not work alongside Mr. Marange the entire morning. This testimony does not discredit Mr. Marange's testimony that he was working by himself when the accident occurred.

Mike Ellzey, a "tack" helper whose testimony was also cited by the trial judge, worked with Mr. Marange for a large part of the morning on which the incident occurred. He admitted that he probably left the cylinder for a water break and to assist as a helper elsewhere during the morning. Mr. Ellzey confirmed that the grinding dust does accumulate so much that a worker can slip in it. He stated that the dust has metal bits in it which stick to you in the hot cylinder and itch when you sit down. The men had to periodically use air hoses to blow the grinding dust out of the cylinder.

Mr. Ellzey stated that he usually grinds while sitting or kneeling on one knee and, as far as he could remember, Mr. Marange was basically doing the same, though he could not remember which position Mr. Marange used. He testified that the men usually rolled the cylinder before doing the side seams, but they only rolled it every other day. When asked whether it was unusual to stand while grinding, Mr. Ellzey responded, "Well, not – yes, ma'am." This answer changed in midstream, as it began with a negative and switched to a positive. Mr. Ellzey's testimony and responses were filled with qualifiers, such as "usually," "basically," "most of the time," "as far as [he could] remember."

7

Neither Mr. Bourgeois nor Mr. Ellzey testified that they had never stood up to grind, or that they had never seen Mr. Marange stand up to grind, or that standing up to grind was impossible, or that it just was not done. They merely testified that they thought it was easier to sit or kneel while grinding and that they did not see Mr. Marange standing to grind on that particular morning. The objective evidence, the photographs of the eight-to-nine-foot-high cylinder and its welds, support Mr. Marange's testimony regarding standing to grind the seams.

The trial judge further indicated that Mr. Ellzey's testimony that the grinder weighed five or six pounds disputed Mr. Marange's testimony that the grinder weighed forty pounds. We note that Mr. Ellzey also said that it was hard to hold the grinder up to grind at shoulder level. This testimony seems to be self-conflicting as it begs the question, if the grinder weighs only five or six pounds, why is it hard to hold up, particularly when you are pressing it against a wall. Moreover, Mr. Marange specifically said that the grinder weighed ten pounds and that with the attachment of the disc and cone, it came to about thirty-five or forty pounds. Kyle Bourgeios testified that the grinder with the disc weighed ten pounds. Contrary to the trial judge's conclusion, the effect of the actual discrepancy does not cast *serious* doubt on Mr. Marange's version of the accident. Three men estimated three different weights for the grinder system.

Mr. Marange weighed 140 to 145 pounds; he was using his weight to push the grinder against the seam in the wall. When his foot slipped in the dust and he pitched forward, the turning grinder would likely have felt heavier to him. Given the mechanics involved, we do not find the weight of the grinder determinative, and the discrepancies in the estimated weight of the apparatus do not justify the conclusion that Mr. Marange's testimony was seriously discredited.

The trial judge further found that the corroborating testimony and circumstances following the event did not preponderate in favor of Mr. Marange.

8

The record does not support this conclusion. Macie Johnson, though not his legal wife, had lived with Mr. Marange for eight years, and they referred to each other as husband and wife. Ms. Johnson testified that she had called Mr. Marange at work on the morning of December 28 because she believed that his mother, who could not speak, might have had a heart attack or another stroke. Mr. Marange left work with permission after the morning break to assist with his invalid mother. Mr. Marange and Ms. Johnson spent some time trying unsuccessfully to get the mother to let them admit her into the hospital. The couple finally went to their home in Vinton and spent the remainder of the day inside the house. Mr. Marange did not mention the incident with his back that day, but Ms. Johnson confirmed that he could not get out of bed when the alarm went off the following morning. She had to help him up and help him get dressed. She asked what was wrong with his back, and he told her that he had been grinding welds at work the previous day and had slipped in the grinder dust. Ms. Johnson confirmed that Mr. Marange called work, spoke to a female employee, and explained that he had hurt his back but did not realize it until he tried to get out of bed. Ms. Johnson further confirmed that Mr. Marange had asked for a doctor and that he was called back thirty minutes later by the female employee and was told that Custom Metal would not pay for anything.

Ms. Johnson then took Mr. Marange to the ER at West Calcasieu Cameron Hospital. Custom Metal suggests that Mr. Marange may have hurt his back trying to lift his mother after he left work on the 28th, but Ms. Johnson, a former construction worker, testified unequivocally that he did not, that she always did the lifting, and that Mr. Marange's mother only weighed eighty-nine pounds. Ms. Johnson's testimony corroborated Mr. Marange's testimony in every respect, as does the medical evidence.

On December 29, 2009, Mr. Marange was seen at the West Calcasieu Cameron Hospital ER at 9:11 a.m. with complaints of burning from his low back

9

to right leg. The medical records indicate an injury on duty while using a grinder the previous day, back pain, decreased range of motion, a shuffling gait, and muscle spasm. The discharge summary at 11:01 a.m. indicates that medication and instruction was given for lumbar radiculopathy. Medication given included Vicodin and Robaxin.

On January 19, 2010, Mr. Marange was seen at W.O. Moss Regional Medical Center ER for low back pain radiating into his right leg due to having slipped at work. Medication given included Ibuprofen, Tramadol, and Flexeril.

On April 20, 2010, Mr. Marange saw Dr. Clark A. Gunderson, an orthopedic surgeon, pursuant to the court's order following Mr. Marange's motion. Dr. Gunderson reported that Mr. Marange was grinding on an eight-foot cylinder; his foot slipped, and the grinder was still running; he sustained a twisting injury to his lower back; and he developed sciatica. At the time of the visit, Mr. Marange had lower back pain radiating into his right buttock and thigh down to his knee. The pain was constant and aggravated by walking, sitting, or standing. Upon examination, Mr. Marange was limping on his right leg, could not walk on his toes and heels, had right sided lumbar spasm, limited lumbar motion, and tenderness to the right of L4-5, as well as in the right sacroiliac and sciatic notch region.

Dr. Gunderson's impression was that Mr. Marange's current problems were related to his work injury of December 28, 2009. He recommended an MRI of the lumbar spine, referred him to physical therapy, and gave him pain medications, muscle relaxants, and anti-inflammatory agents. Dr. Gunderson did not believe that Mr. Marange could work and classified him as temporarily disabled. Dr. Gunderson expected to see Mr. Marange for follow-up on May 18, 2010, but none of the recommended treatment, imaging, or follow-up was authorized.

Mr. Marange was again seen at the West Calcasieu Cameron ER on July 10, 2010, due to the work injury several months prior, with acute low back pain and burning, decreased range of motion, and muscle spasm. The medical report indicates no new injury, but rather continuing low back pain that was worse upon waking that day. Medication given included Flexeril, Medrol Pak, and Ultram.

The foregoing objective medical evidence is consistent. It supports Mr. Marange's testimony regarding a work-related accident and militates against the trial judge's finding to the contrary.

Custom Metal contends that Mr. Marange did not have an accident at work because he reported no accident and felt no injury at the time of the alleged accident as required under La.R.S. 23:1021(1). We disagree. Louisiana Revised Statutes 23:1021(1) provides: "'Accident' means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." Mr. Marange testified that his foot slipped in the grinding dust; he fell forward with the grinder turning; he twisted his back and felt pulling and burning in his low back and buttocks at the time. "[M]erely because a worker completes a day's work without reporting an accident does not preclude the worker from recovering compensation." *Bruno*, 593 So.2d at 362.

In *Bruno*, where the accident was unwitnessed, the Louisiana Supreme Court overturned our reversal and upheld the OWC's finding that the claimant had sustained a work injury. The court stated:

> Louisiana courts consistently have interpreted the work-related accident requirement liberally. *Williams v. Regional Transit Authority*, 546 So.2d 150, 156 (La.1989). Indeed, it is well-settled in Louisiana that an "accident" exists when "heavy lifting or other strenuous

11

> efforts, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a pre-existing condition." *Cutno v. Neeb Kearney & Co.*, 237 La. 828, 112 So.2d 628, 631 (1959); *Nelson* [*v. Roadway Express, Inc.*, 588 so.2d 350 (La.1991)] (collecting cases). Moreover, Louisiana courts view the question of whether there was an accident from the worker's perspective. *Williams*, [546 So.2d 150].

*Bruno*, 593 So.2d at 360.

In *Capitol Manufacturing Co.*, 745 So.2d 825, an unwitnessed accident occurred twenty minutes before quitting time on a Friday. The claimant fell off of a ladder and experienced immediate pain in his back but did not report it or seek medical attention until the following Monday when he left work and went to the ER. A co-worker to whom the plaintiff mentioned the accident on the night it occurred did not recall the conversation and testified that he did not learn of the accident until a week later. Notwithstanding, where the medical evidence supported the complaints of pain, we affirmed the OWC's finding that a work accident had occurred and that the claimant's actions immediately after the accident were reasonable under the circumstances. "When there is proof of an attendant disability, without an intervening cause, it is presumed that the accident caused the disability." *Id.* at 829.

In *Richard v. Temple-Inland*, 625 So.2d 335 (La.App. 3 Cir. 1993), we reversed the OWC's finding that the claimant sustained no work injury, because the hearing officer failed to follow the legal principles governing the required proof of an accident as laid down in *Bruno* and *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979). That is, while there were inconsequential discrepancies in the testimony, they did not support the OWC's conclusion that the claimant's version was not credible. There, as here, the claimant's testimony regarding the accident and injury was really not seriously discredited; nor was it contradicted to the extent that serious doubt was cast on the plaintiff under *Bruno*

12

and *West*. No such serious doubt exists in this case, particularly where Mr. Marange's version of the accident and injury is clearly corroborated by both medical and lay testimony.

Given the existence of a work-related injury, the OWC was manifestly erroneous in failing to order the payment of Mr. Marange's related medical treatment and expenses, which we award at this time. As outlined above, Mr. Marange was seen and treated at West Calcasieu Cameron Hospital, where he incurred expenses of $1,081.50. He was seen at W.O. Moss Regional Medical Center and incurred $111.24 in medical expenses; and his bill with Radiology Associates was $50.00. We, therefore, award $1,242.74 for past medical expenses. Custom Metal paid $328.00 for the court-ordered medical examination by Dr. Clark Gunderson, but did not authorize the return visit, the MRI, or the physical therapy recommended by Dr. Gunderson. As described above, Dr. Gunderson related Mr. Marange's injuries to his work accident and found him temporarily totally disabled (TTD). Accordingly, the demand for treatment recommended by Dr. Gunderson, and the demand for TTD benefits, should have been granted.

Mr. Marange earned $15.00 per hour. Under La.R.S. 23:1021(12)(i), he is entitled to the presumption that he worked forty hours per week during the four full weeks preceding the accident, and can have his wage benefit calculated on an average weekly wage (AWW) of $600.00, if he was a full-time employee and regularly worked forty hours per week. If, however, he was offered forty hours per week and regularly chose to work less than forty hours, his AWW will be calculated on "the average of his total earnings per week for the four full weeks preceding the date of the accident," pursuant to La.R.S. 23:1021(12)(ii).

The record reveals that Mr. Marange worked overtime one week and worked forty hours one week, but clocked out early on several occasions and did not regularly work forty hours per week during the two months that he had been

13

employed with Custom Metal. Michael McKean, Mr. Marange's regular supervisor, testified that forty hours of work had been available weekly and that Mr. Marange had left for personal business four times in seven weeks. Kyle Bourgeois, Mr. Marange's acting supervisor, said everyone occasionally left early for personal business, but there was enough work for forty hours per week. Accordingly, Mr. Marange will not be entitled to the forty-hour presumption under subsection (12)(i). Rather, his AWW for TTD benefits should be calculated on the average of his total earnings per week for the four full weeks preceding the date of the accident, pursuant to La.R.S. 23:1021(12)(ii). Mr. Marange's wage records indicate that he earned $2,116.63 in the four full weeks prior to December 28, 2009. Therefore, his AWW is $529.16 ($2,116.63 ÷ 4 = $529.16).

Mr. Marange further asserts that the OWC erred in failing to award penalties and attorney fees where Custom Metal failed to investigate and failed to reasonably controvert his workers' compensation claim. We agree. The purpose of imposing penalties is to "nudge the employer into making timely payments when there is no reasonable basis for refusing or delaying its obligation." *Weber v. State*, 93-62, p. 8 (La. 4/11/94), 635 So.2d 188, 193. An employer refusing to pay benefits has an affirmative duty to investigate an employee's claim and to ascertain the exact nature of his complaints; the employer's failure to do so warrants the imposition of attorney fees and penalties. *See Capitol Mfg. Co.*, 745 So.2d 825. There, we found that penalties and attorney fees were warranted where the employer refused to complete an accident report and failed in its duty to investigate the employee's claim or ascertain the exact nature of his complaints.

Louisiana Revised Statutes 23:1201(F), which is mandatory, provides for reasonable attorney fees and for penalties of up to $2,000.00 for the non-payment of each disputed claim, not to exceed $8,000.00 in penalties, unless the

employer reasonably controverts the claim or the non-payment results from a condition over which the employer had no control.

> In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La.R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.

*Celestine v. Firestone Polymers, L.L.C.*, 09-1534, p. 14 (La.App. 3 Cir. 5/5/10), 38 So.3d 527, 538, *writ denied*, 10-1237 (La. 9/17/10), 45 So.3d 1055 (quoting *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890).

Here, Mr. Marange reported the accident early on the morning after the accident occurred, and he asked for medical treatment on that day. Within thirty minutes, he received a call from the employer stating that the employer would not pay for any medical treatment. Mr. Marange was not questioned about the accident or his injuries. The basis for the denial was that he did not report the accident on the day that it occurred. The employer's duty to investigate and to gather factual and medical information on the employee's workers' compensation claim is continuing. *Celestine*, 38 So.3d 527. Mr. Marange's subsequent demands for medical treatment and wage benefits were ignored. When Mr. Marange finally obtained a court-ordered examination by Dr. Gunderson in April of 2010, Dr. Gunderson took Mr. Marange off work for a month and requested authorization for an MRI. He also prescribed physical therapy. Custom Metal denied all benefits and provided no factual or medical information to reasonably counter the factual and medical information presented by Mr. Marange.

As we stated in *Ducote v. Louisiana Industries, Inc.*, 07-1536, p. 4 (La.App. 3 Cir. 4/2/08), 980 So.2d 843, 846:

> In *Fontenot v. Reddell Vidrine Water District*, 02-439, p. 18 (La. 1/14/03), 836 So.2d 14, 27, our supreme court interpreted La.R.S. 23:1201(F) as providing "multiple penalties for multiple violations of compensation and medical benefits claims." However, the supreme court left it to the office of workers' compensation and the appellate courts to "ferret out" what actions by the employer warranted the imposition of separate penalties. *Id.* at 26.
>
> When presented with a claim for multiple penalties, the first circuit made the following observation:
>
> > From these cases, we can glean the following guidelines: bills from different medical providers can be considered as separate claims; failure to authorize a surgery by a particular doctor can be considered a separate claim from other treatment costs by the same doctor; the mileage expense associated with treatment by a particular provider is part of the claim for payment of that provider's treatment; incorrect calculation of a benefit amount is a separate claim from the failure to actually pay benefits; and that reduction of a benefit amount constitutes yet another separate claim on which penalties may be imposed.
>
> *Juracovich v. St. Anne Gen. Hosp.*, 04-1323, p. 4 (La.App. 1 Cir. 6/10/05), 916 So.2d 264, 266, *writ denied*, 05-1819 (La. 1/27/06), 922 So.2d 552.

Here, where we have found that medical payments are owed to West Calcasieu Cameron Hospital, W.O. Moss Regional Medical Center, Radiology Associates; and where authorization for an MRI was denied, physical therapy was denied, and a follow up visit with Dr. Gunderson was denied; and where TTD benefits were denied, we award Mr. Marange $8,000.00 in penalties.

Additionally, we award attorney fees in the amount of $15,000.00 for the work done by Mr. Marange's attorney at the trial court level, and we award $5,000.00 in attorney fees for the work done on appeal.

16

## V.

## <u>CONCLUSION</u>

Based upon the foregoing, the OWC judgment is reversed, and Henry Marange is awarded medical and wage benefits as discussed in this opinion.  Mr. Marange is further awarded penalties in the amount of $8,000.00 and attorney fees in the total amount of $20,000.00.  Costs of this appeal are assessed to the employer, Custom Metal Fabricators, Inc.

**REVERSED AND RENDERED**.